A. Ernest **FITZGERALD**, Plaintiff,

v.

Robert C. **SEAMANS**, Jr., et al.,
Defendants.

**Civ. A. No. 74–178.**

United States District Court,
District of Columbia.

Oct. 9, 1974.

John Bodner, Jr., Washington, D. C., for plaintiff.

John Kelson, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

GESELL, District Judge.

This action seeks $3,500,000 in compensatory and punitive damages resulting from an alleged conspiracy among various Government officials to deprive plaintiff of his Government job and to violate his constitutional rights. The matter comes before the Court on defendants' motion to dismiss, or in the alternative, for summary judgment. Several defenses are raised, including the statute of limitations, the doctrine of official immunity, the claim that the administrative remedy before the Civil Service Commission is exclusive, and various procedural points. Each of defendants' contentions raises serious doubts as to the viability of plaintiff's cause of action but for reasons set out below, the Court need reach only the defense that the statute of limitations has run. This issue has been fully argued and briefed.

The complaint was filed January 25, 1974, and recites plaintiff's dismissal from Federal Government service and related events. Plaintiff's dismissal was announced in November, 1969, and became effective January 5, 1970. Both sides agree that the three-year statute of limitations contained in D.C.Code § 12–301(8) (1973) is applicable. See Macklin v. Spector Freight Sys., Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 994 (1973). The Court has concluded that this action, filed four years after the dismissal, is barred under this statute of limitations.

Plaintiff advances three basic arguments to dispute this conclusion. First, plaintiff argues that although the dismissal admittedly occurred outside the period set by the statute of limitations, the conspiracy which caused it has continued. Secondly, plaintiff argues that as part of the continuing conspiracy, its members fraudulently concealed certain crucial facts from him, thereby precluding him from bringing this action within the three-year period set by the statute. Finally, plaintiff urges that in any event the conspiracy has continued to inflict injury on him up to the very date this lawsuit was filed sufficient to make the continuing tort exception to the statute of limitations applicable. As will be seen from what follows, each of these arguments must be rejected.

Before turning to a detailed consideration of the merits of plaintiff's arguments, however, a brief summary of the background of this case will be helpful in order to put the issues in proper perspective. Plaintiff was discharged from his job as Deputy for Management Systems in the Department of the Air Force allegedly in retaliation for testimony he had given before a congressional committee on November 13, 1968, at which he disclosed a $2 billion cost overrun on the C–5A aircraft project. Before his dismissal took effect, a congressional committee inquired into the circumstances and some facts now relied on were revealed.[1] Once his dismissal occurred, plaintiff appealed to the Civil Service Commission, raising issues substantially identical to those which he seeks to raise in this lawsuit. In a letter dated January 20, 1970, to the Civil Service Commission appealing the dismissal, plaintiff claimed that he had been fired in retaliation for his testimony to Congress. In addition, he charged that a concerted campaign had been undertaken by certain Government officials to harass and discredit him, which included an extensive investigation of his personal life, and the circulation of false charges about him designed to justify his dismissal. Full hearings on these claims ensued.

On September 18, 1973, after extensive hearings in which over 4,000 pages of testimony was heard and in which several of the present defendants testified, the Commission found that plaintiff's dismissal had been illegal and rec-

---

1. See, generally, Hearings on the Dismissal of A. Ernest Fitzgerald by the Department of Defense Before the Subcomm. on Economy in Government of the Joint Economic Comm., 91st Cong., 1st Sess. (Nov. 17–18, 1969).

ommended that he be reinstated to the same or a comparable position with full back pay. However, the Examiner specifically found that plaintiff had not been fired in retaliation for his congressional testimony. The Examiner's ruling was based on the narrower ground that a reduction in force, which purported to eliminate plaintiff's job as an economy measure, had been in contravention of Civil Service Commission regulations because motivated by "reasons purely personal" to plaintiff. An appeal relating solely to the issue of attorney's fees was taken from that decision, which had been favorable to plaintiff but was based on grounds narrower than he had urged. The final decision, still in plaintiff's favor on the merits, was entered on January 3, 1974.

Thereafter, on January 25, 1974, plaintiff brought the present action through the same counsel who had represented him in the Civil Service Commission proceedings. While not framed as a collateral attack on the Examiner's conclusion that plaintiff had not been fired in retaliation for his testimony to Congress, the complaint in the present lawsuit raises essentially the same issues which were before the Civil Service Commission. The damages plaintiff claims to have suffered at the hands of the conspirators are:

[I]njury and interruption to his professional career, including loss of his job, loss of present and future income, and destruction of professional and personal relationships; and injury to his person, including violation of privacy, severe mental distress and anguish, and deprivation of his civil and constitutional rights.[2]

Nine defendants, present and former Government officials, are named in the action, plus "One or More White House Aides" presently unknown and styled "John Does."[3] The complaint recites that on or about November 13, 1968, the date plaintiff first testified to Congress concerning cost overruns on the C–5A, the defendants joined together in a conspiracy to deprive him of his constitutional rights, including his right to provide information to Congress and his right not to be deprived of his job with the Air Force without due process, "because, *inter alia,* of his testimony."

In furtherance of the conspiracy, the defendants allegedly fabricated false reports impugning plaintiff's conduct in order "to justify [his] termination." In addition, the defendants allegedly caused a secret investigation to be carried out and as a result misrepresented plaintiff's "trustworthiness . . . as an employee of the Department of the Air

2. The violation of privacy in question relates to an investigatory file which was maintained on Fitzgerald by the Air Force Office of Security Investigations. The defendants claim the file arose out of certain conflict of interest charges which had been made against Fitzgerald, while the plaintiff claims that the investigation was an attempt to find information which could be used to justify his dismissal.

The other constitutional rights referred to are a First Amendment right to testify to Congress without intimidation and an asserted violation of plaintiff's right not to be fired from Government employment without due process of law. *But cf.* Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

The defendants, of course, question whether or not an action for such injuries will lie where a Government employee has already received a remedy, in the form of reinstatement and back pay, for what are at least

closely related injuries through the administrative process. The Court need not reach these issues.

3. The affidavits indicate that former President Nixon, Secretary of State Kissinger, and former White House aides Haldeman, Ehrlichman, Colson, Dean, Magruder, Klein, Nofziger and Ziegler are among the potential "John Doe" defendants.

Defendant Seamans, then Secretary of the Air Force, admitted at the Civil Service Commission hearings to having received "advice" from the White House on how to handle the Fitzgerald matter, but claimed executive privilege with regard to the substance of those conversations. (CSC Tr. 839, 1454).

Plaintiff contemplates that extensive additional discovery would be needed in this action to discover what role various White House aides played in the conspiracy. *But see* United States v. Nixon, 417 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

Force," threatened to fire him and did fire him.

The crucial fact which cannot be glossed over in this lawsuit is that the key events in issue are the firing and the machinations which led up to it. These events occurred well outside the period set by the statute of limitations. Plaintiff was well aware of these events before the statute of limitations ran on his claim and in fact he presented most of the same charges he makes in this lawsuit to the Civil Service Commission.

### Continuing Conspiracy

The three-year statute of limitations embodied in D.C.Code § 12–301(8) (1973) runs "from the time the right to maintain the action accrues," and in tort actions this has been interpreted to mean the time injury results from the

wrongful acts. Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson, 127 U.S.App.D.C. 93, 381 F.2d 261 (1967).[4]

Since the dismissal was effective January 5, 1970, the three-year statute of limitations ran out in January, 1973, a year before the present action was filed, unless additional acts by the conspirators causing injury are alleged subsequent to the dismissal. Despite the extensive ventilation of these issues which has occurred in other forums and the fact that the Court, over defendants' strenuous objection, permitted the plaintiff limited discovery in this action, neither the complaint nor the extensive affidavits in support of it allege any independently actionable acts by the conspirators causing injury subsequent to the dismissal or its immediate aftermath.[5]

4. After oral argument, plaintiff filed a supplemental affidavit asserting the conclusion that the full extent of his injuries could not have been determined at the time of his discharge. He contends that his damages were therefore too speculative for the cause of action to have accrued at that time under the rule of Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338–342, 91 S. Ct. 795, 28 L.Ed.2d 77 (1971).

In Zenith the court held where claims for future lost business profits are too speculative to be awarded, a cause of action to recover them has not yet accrued but may be brought later when experience has made clear what the actual profit loss will be, at least in those cases which fall within the continuing tort exception, discussed infra. See Macklin v. Spector Freight Sys., Inc., supra, 478 F.2d at 995, n. 30.

Although the Court is aware of no case in which the Zenith rationale has been applied outside the peculiar area of future profits, assuming it to be more broadly applicable, nothing in the affidavit indicates that Fitzgerald's alleged damages were more speculative four years ago than they are today.

Damages are not so speculative that a cause of action does not accrue under Zenith simply because they are not yet liquidated. In this case, a jury could have estimated Fitzgerald's damages based on competent evidence if this case had been brought within the three-year period.

Plaintiff has wholly failed to make out a colorable claim that his damages were prohibitively speculative and the Zenith rule is therefore inapplicable. See Railing v. United Mine Workers, 445 F.2d 353, 355 (4th Cir. 1971); Continental-Wirt Electronics

Corp. v. Lancaster Glass Corp., 459 F.2d 768, 770 (3rd Cir. 1972); see also Akron Presform Mold Co. v. McNeil Corp., 496 F.2d 230, 233 (6th Cir. 1974).

5. At oral argument, plaintiff's counsel contended that implicit in the general allegation that the conspirators "covered up" their unlawful acts was the notion that they may have acted to delay the Civil Service Commission proceedings.

Those hearings began on May 4, 1971, but over Fitzgerald's objection they were held behind closed doors pursuant to the regulations then in effect, 5 C.F.R. § 772.-305(c)(3), 33 Fed.Reg. 12497 (1968). While the hearings continued, Fitzgerald filed a lawsuit to require that they be open to the public, in which he ultimately prevailed, see Fitzgerald v. Hampton, 329 F. Supp. 997 (D.D.C.1971) (C.A. No. 1109–72), aff'd, 152 U.S.App.D.C. 1, 467 F.2d 755 (1972).

The record in that case indicates that on June 22, 1971, after plaintiff's motion for a preliminary injunction asking that the hearings be open to the public was denied, plaintiff sought and was granted a temporary restraining order against further closed hearings, and the hearings were then suspended. The District Court entered judgment in Fitzgerald's favor and refused to stay the effect of the order pending appeal. A stay was granted by the Court of Appeals on November 18, 1971. Despite the Government's request that the case be heard on an expedited schedule, final judgment did not enter until January 17, 1973. The Civil Service Commission proceedings began again, now open to the public, nine days later on January 26, 1973.

■ The complaint does allege that the conspiracy continued after the firing and that the conspirators misrepresented the true reasons for the dismissal to Congressmen and others and otherwise sought to conceal and "cover up" their prior unlawful acts. The allegation that a conspiracy continues within the limitations period is of no consequence to the running of the statute of limitations unless tortious overt acts pursuant to the conspiracy are committed within that period. Lambert v. Conrad, 308 F.2d 571 (9th Cir. 1962). This rule is a natural outgrowth of the long-settled principle that a civil conspiracy is not in itself actionable, but rather, it is the acts causing injury undertaken in furtherance of the conspiracy which give rise to the action. Edwards v. James Stewart & Co., 82 U.S.App.D.C. 123, 160 F.2d 935, 937 (1947); Radford v. United States, 264 F.2d 709 (5th Cir. 1959). As noted, no independently actionable acts causing injury by the conspirators are here alleged within three years prior to the filing of this action. The mere allegation that the conspiracy continued as a conspiracy of silence, or even active concealment, within the limitations period will not suffice to make actionable those acts of the conspirators on which the statute of limitations has run. We turn, therefore, to plaintiff's second argument that the "cover-up" amounted to fraudulent concealment of material facts sufficient to toll the statute of limitations.

### Fraudulent Concealment

Plaintiff argues that the fraudulent concealment of material facts by the conspirators precluded him from bringing this lawsuit within the statutory period and that therefore the statute of limitations was tolled. The nub of this contention is stated in the following passage from plaintiff's brief:

> Because of the delays in the proceedings before the Civil Service Commission and because of the efforts of de-

fendants and others to prevent the disclosure of facts involving actions taken against plaintiff, the depth and scope of the conspiracy remained hidden, and has not even to this day become fully known. However, it was only during those hearings that plaintiff was at all able to discern the outline of a course of conduct deliberately calculated to deprive him of his constitutional and civil rights.

■ It is a rule of general application in the Federal Courts that the fraudulent concealment of the facts which render a transaction actionable tolls the statute of limitations. Holmberg v. Armbrecht, 327 U.S. 392, 66 S. Ct. 582, 90 L.Ed. 743 (1946); Moviecolor Limited v. Eastman Kodak Co., 288 F.2d 80 (2d Cir. 1961). In order to make out a claim of fraudulent concealment, several elements must be shown. First, it must appear that the information fraudulently concealed was material. If plaintiff's delay in bringing the lawsuit is to be excused, the Court must have reason to believe that the "timely assertion" of plaintiff's rights "has been postponed as a result of the fraud of the party against whom liability might otherwise have been urged." Searl v. Earll, 95 U.S.App.D.C. 151, 221 F.2d 24, 26 (1954). This requires that the information concealed be "so material in character that knowledge of a basis for, or intelligent prosecution of, the cause of action was precluded." Emmett v. Eastern Dispensary & Casualty Hospital, 130 U.S.App.D.C. 50, 396 F.2d 931, 937 (1967). Mere ignorance of evidentiary details, although such information might be useful at trial, will not suffice. Moviecolor Limited v. Eastman Kodak Co., supra, 288 F.2d at 87.

■ Similarly, the fraudulent concealment must actually succeed in precluding the plaintiff from acquiring knowledge of the material facts. Where "the plaintiff knew, or by the exercise of due diligence could have known, that

Under the circumstances, plaintiff's conclusory allegation that the conspiracy caused the delay is of no avail. Williams v. Kolb, 79 U.S.App.D.C. 253, 145 F.2d 344 (1944);

Dewey v. Clark, 86 U.S.App.D.C. 137, 143, 180 F.2d 766, 772 (1950); Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App. D.C. 31, 433 F.2d 1137, 1141 (1970).

he may have had a cause of action," the claim that the statute of limitations has been tolled by defendants' fraudulent concealment of the facts must fail. Westinghouse Elec. Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 351 F.2d 762, 764 (1965); Emmett v. Eastern Dispensary & Casualty Hospital, *supra,* 396 F.2d at 938. It would be anomalous indeed if under the modern Federal Rules of Civil Procedure, which provide for notice pleading and liberal opportunities for discovery, a plaintiff could succeed in a claim of fraudulent concealment merely by alleging that the full "depth and scope of the conspiracy remained hidden" from him and "has not even to this day become fully known." *See* Rickel v. Levy, 370 F.Supp. 751, 756 (E.D.N.Y.1974).

Therefore, in the case of a civil conspiracy it has been held to be irrelevant to the running of the statute of limitations that the plaintiff did not know of a formal agreement among the parties when the plaintiff did know that the acts of the defendants were causing injury and believed these acts to be illegal. Suckow Borax Mines Consolidated v. Borax Consolidated, 185 F.2d 196, 209 (9th Cir. 1950).

While there is substantial doubt in the Court's mind that any of the activities of the defendants amount to the kind of active concealment or breach of a duty to disclose necessary to make out a claim of fraudulent concealment, *see* Magee v. Manhattan Life Ins. Co., 92 U.S. 93, 98, 23 L.Ed. 699 (1876), it is unnecessary to reach that issue since it is clear that the claim of fraudulent concealment must fail because, in truth, there was no material concealment. Plaintiff not only knew the essential facts relating to his cause of action well before the statute of limitations ran on his claim, but also publicly alleged many of the same evidentiary details which he reasserts in this lawsuit.

In a letter to the Civil Service Commission dated January 20, 1970, appealing from the dismissal, which has been made defendants' exhibit 10 in this lawsuit, plaintiff's counsel enumerated the same underlying facts which are the basis for the present complaint. For example, in that letter, which in turn drew on the congressional hearings on the dismissal which had been held in November 1969, plaintiff claimed that he had been fired for his congressional testimony, as he does in this lawsuit.[6]

---

6. *Complaint in this Action*

¶16 On November 13, 1968, plaintiff testified concerning the cost overruns on the C–5A project over objection of defendants. . . .

¶19 Beginning on or about November 13, 1968, . . . defendants, because, *inter alia,* of plaintiff's testimony . . . plotted and conspired to deprive plaintiff of his constitutional rights, to deprive plaintiff of his right of prvacy, to prevent plaintiff from furnishing information to Congress and to members of Congress in violation of his rights under the First Amendment [and] 5 U.S.C. § 7102, to permanently injure the future career of plaintiff and to deprive plaintiff of his position as Deputy for Management Systems in the Department of the Air Force.

*Defendants' Exhibit 10*

"His firing was cuased [sic] by his testimony before Congress in which he revealed a cost overrun on the C5A transport plane of $2 billion. . . . Mr. Fitzgerald's firing and the events leading up to it constituted a violation of his rights under the United States Constitution, [and] a violation of federal laws, *e. g.,* 5 U.S.C. § 7102 . . . . ." pp. 2–3

See also, Affidavit of Mr. Fitzgerald in Fitzgerald v. Hampton, C.A. 1109–71, dated June 4, 1971, ¶4: Unless the hearing is public, "my character and reputation will forever be clouded in the eyes of the public and potential future employers with unfounded and unproved rumors which may prevent my reinstatement or reemployment by the federal government or my employment in private industry."

The letter like the present complaint, also claims that the investigation of Mr. Fitzgerald, defendant Seaman's charges that Fitzgerald had released "confidential" information to congressional committees, and the circulation of false reasons to justify the dismissal were all facets of a concerted program of "harassment" carried out against the plaintiff.[7]

The gravamen of the complaint in the present action is that because plaintiff released to Congress embarrassing information relating to military procurement contracts, various Government officials banded together and through concerted activity on a number of fronts sought to drive him out of the Government and discredit him. In order to provide a publicly acceptable rationale for their actions against him, these officials alleg-edly conducted a broad investigation of plaintiff in an attempt to ferret out facts which could be used to justify his dismissal. Failing that, they allegedly circulated various spurious reasons to justify the dismissal.

These facts, albeit disputed, are essentially what emerged in the congressional hearings into the dismissal and in numerous press accounts regarding the incident. More importantly, they are precisely the same charges which Fitzgerald made in his January 20, 1970, letter to the Civil Service Commission appealing the dismissal and incorporating many of the same evidentiary particulars he again recites in his affidavit in this lawsuit.

Thus all that is really new in this lawsuit is the charge that the White House was part of the conspiracy and

| 7. *Complaint in this Action* | *Defendants' Exhibit 10* |
|---|---|
| ¶20 The defendants . . . performed, *inter alia*, the following unlawful, illegal and tortious acts: | "In May, 1969, a personal element entered into the picture. Unknown to Mr. Fitzgerald, Secretary of the Air Force Seamans testified falsely before a closed session of the Committee on Armed Services . . . that Mr. Fitzgerald had released confidential documents to members of Congress. Mr. Seamans made other derogatory and untrue comments about Mr. Fitzgerald to that Committee." p. 10. |
| (a) Falsely and maliciously fabricated and concocted reports to justify plaintiff's termination . . . including false reports that plaintiff had committed security violations . . . and that plaintiff had conflicts of interest. . . . | |
| (c) Caused secret investigations of plaintiff's personal life and background to be made without justification and without the knowledge and/or consent of plaintiff; | "There have been many reasons other than the official one given by high government officials as to why Mr. Fitzgerald has been separated from the Air Force. . . . [Defendant Schedler] told certain members of Congress that Mr. Fitzgerald had been fired because he was not a 'team player.'" pp. 13–14. |
| The foregoing acts were performed in part to . . . attempt to prevent plaintiff from testifying before the Congress . . . . | "Brigadier General Joseph Cappucci [also a defendant herein] . . . conducted an investigation file on Mr. Fitzgerald." p. 12 |
| | See also, Complaint filed June 3, 1971, *Fitzgerald v. Hampton*, C.A. 1109–71, ¶7: "Since plaintiff Fitzgerald first testified in November 1968, . . . he has been harassed in many ways, including being investigated secretly by the Air Force, which prepared a dossier alleging personal improprieties and initiated gossip about him."; |

"cover-up" and the concomitant "need" for extensive discovery from various former White House aides. It is possible that the claim of executive privilege before the Civil Service Commission denied plaintiff full disclosure of the reasons behind the firing. Had this evidence been available, the Examiner might have accepted plaintiff's view of the motives behind his dismissal in its entirety and granted him the total vindication he seeks. However, it cannot be said that the essential issues were unknown to plaintiff before the statute of limitations ran out. They were, in fact, the same issues he brought before the Commission. That not all the supporting evidence relating to the role and identity of every single conspirator was available to him then—just as this evidence remained unavailable to him when he filed the present complaint naming several "John Doe" defendants—will not toll the statute of limitations, since such evidence is not crucial to the bringing of the action. *Cf.* Emmett v. Eastern Dispensary & Casualty Hospital, *supra*, 396 F.2d at 938.

■ At oral argument, plaintiff's counsel supplemented the general thrust of his argument relating to fraudulent concealment by contending that until the Civil Service Commission hearings brought to light certain unspecified facts, plaintiff could not discern a concerted pattern of harassment by Government officials acting outside the scope of their authority. Initially, it is suggested, plaintiff viewed the firing as wrong, but sufficiently within the scope of official duties so that an action for damages would have been barred by the doctrine of official immunity.[8] However, the letter to the Civil Service Commission appealing the dismissal is once again dispositive, for in it plaintiff clearly maintained, for reasons no better and no worse than he presently advances, that the acts of harassment he had suffered had been unauthorized and completely outside the ambit of legitimate official functions. For example, while discussing the investigatory file on Fitzgerald, counsel wrote:

> Further efforts were made to discredit Mr. Fitzgerald personally. Brigadier General Joseph Cappucci, Director of the Office of Security Investigations in the Air Force, conducted an investigation of Mr. Fitzgerald and maintained an investigative file on Mr. Fitzgerald. Secretary Seamans confirmed that a file was maintained by General Cappucci on Mr. Fitzgerald, but stated: 'I have found from him [General Cappucci] that there had never been requested an investigation, nor had an investigation ever been carried out in this case. . . .' Economy in Government Hearings, November 18, 1969, p. 151 [sic. p. 118] . . . . The investigation undertaken by General Cappucci was only one example of the many efforts undertaken by the Air Force and others to discredit the personal integrity of Mr. Fitzgerald. pp. 11–12.

If this is not on its face an allegation, in part supported by Secretary Seamans' testimony, of a concerted pattern of actions taken outside the scope of official authority to discredit the plaintiff, it is at least such a circumstance as would prompt a man of reasonable diligence to suspect that the defendants were acting outside the scope of their authority.

### Continuing Tort

The final argument advanced by plaintiff is that he has been the victim of a conspiracy which "even today is causing him injury." As noted above, the allegation that a civil conspiracy itself continues within the period set by the statute of limitations is of no consequence unless tortious acts causing injury are committed during that period. Plaintiff, however, claims he has suffered continuing injury from the acts of

---

8. It is by no means self-evident to the Court that the doctrine of official immunity is not a bar to the present action. *Compare* Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L. Ed.2d 1434 (1959), *with* Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and Apton v. Wilson, 506 F.2d 83 (D.C.Cir. 1974).

the conspirators sufficient to come within the ambit of cases relating to continuing or repetitive torts. On the facts and circumstances of this case, that argument must be rejected since it confuses an act causing injury within the statutory period with an injury which continues because of a passive failure to remedy it thereafter.

In a number of cases dealing with acts which are by their nature of a repetitive character, the courts have held that those injuries in the series which occur within the period delimited by the statute of limitations may be the subject of a successful action, even though the tortious course of conduct may have originally begun outside the limitations period. Thus, in Underwater Storage, Inc. v. United States Rubber Co., 125 U.S.App.D.C. 297, 371 F.2d 950, 955 (1966), cert. denied, 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967), where a trade secret had originally been misappropriated outside the period set by the statute of limitations, it was held that the wrongdoer was nonetheless "amenable to suit for any use of the secret so long as the use has occurred within the statutory period of limitations. . . ."

A similar case is Macklin v. Spector Freight Sys., Inc., *supra*, 478 F.2d at 987, in which the Court of Appeals read a pro se complaint to allege "not merely . . . an isolated refusal of employment occurring in early 1967, but . . . maintaining and supporting a discriminatory hiring system throughout 1967 and 1968." What was actionable in *Macklin* was not merely the isolated act in 1967 but rather the series of acts continuing into 1968 to perpetuate the discriminatory system. Judge Wright, writing for the Court in *Macklin*, was careful to distinguish between a layoff, which suggests subsequent recall or new hiring which repeats the wrongful acts of discrimination, and a simple wrongful discharge, which is a discrete act caus-

ing a single legal injury even though the amount of damages needed to remedy the injury in the form of a backpay award may continue to accrue. In the course of discussing the case of Cox v. United States Gypsum Co., 409 F.2d 289, 290 (7th Cir. 1969), from which this distinction is drawn, the Court of Appeals in *Macklin, supra,* 478 F.2d at 987, wrote the following:

> *Cox* stressed that a layoff, as distinguished from a discharge or quitting, tends to suggest a possibility of reemployment and a claim of continuing discrimination 'readily suggests that he claims there has been subsequent recall or new hiring which discriminates against him.'

Here there is no such allegation of continuing wrongful acts, but only the claim that the conspirators refused to act to remedy the wrong by reinstating plaintiff.

Plaintiff misconstrues these cases as supporting the proposition that so long as an employer does not reinstate a wrongfully discharged employee, the employee continues to suffer injury and the statute of limitations does not begin to run. Such a rule would eviscerate the policy of rest implicit in the statute of limitations, since a lawsuit concerning a wrongful discharge would be timely decades later if the employee had not been voluntarily rehired. That a wrong continues to injure a person until it is righted cannot mean that the statute of limitations does not begin to run until the plaintiff is made whole, since that is the very purpose for which any lawsuit is brought. What is required to come within the continuing tort exception, and what is lacking here, is another wrongful injurious act within the statutory period repetitious of pre-limitation period acts, not simply a passive refusal to remedy wrongful pre-limitation period acts.[9] *Compare* Garelick

9. At oral argument, plaintiff's counsel supplemented the allegations of the complaint by claiming that members of the conspiracy acted to block efforts, largely those of Mr. Clark Mollenhoff, to get Mr. Fitzgerald rein-

stated or transferred rather than fired. Intervening to dissuade the President from issuing a discretionary order to reinstate Fitzgerald as a matter of equity and good politics would not be an independently ac-

v. Goerlich's, Inc., 323 F.2d 854, 856 (6th Cir. 1963), *with* Pioneer Co. v. Talon, Inc., 462 F.2d 1106 (8th Cir. 1972).

■ This action, despite the allegation of a conspiracy causing continuing injury, cannot be made to come within the continuing tort exception to the statute of limitations. Absent a repetition of the wrongful conduct within the three years immediately prior to the filing of this lawsuit, the continuing tort exception is inapplicable and the Court so holds.

■ Finally, although plaintiff has nowhere argued the point, the Court notes that the statute of limitations was not tolled by the filing of the appeal from the original dismissal to the Civil Service Commission. *Compare* Macklin v. Spector Freight Sys., Inc., *supra,* 478 F.2d at 994, n. 30. Since plaintiff won reinstatement and backpay before the Civil Service Commission, he must necessarily be seeking damages for injuries separate and distinct from those for which he has already been fully compensated. Thus, his present cause of action is an independent claim, albeit factually related, from that which was presented to the Civil Service Commission. *Cf.* Butterman v. Steiner, 343 F.2d 519 (7th Cir. 1965).

In summary, plaintiff cannot bring this action in 1974 for events surrounding his discharge from Government service in 1970. The three-year statute of limitations bars this action, despite the fact that it has been framed to allege a continuing conspiracy. The allegation of a "cover-up" after the firing is of no consequence since it is clear that Fitzgerald knew the essential facts he alleges in this lawsuit long ago and was not precluded from bringing this action within the period set by the statute of limitations by any fraudulent concealment of material facts by the defend-

ants. The allegations of continuing injury are similarly unavailing, since there are no allegations of any wrongful acts sufficient to give rise to an action within the three years prior to the filing of this lawsuit.

Implicit in the statute of limitations is the notion that any case or controversy must eventually be allowed to die a natural death through the passage of time. Society has an interest in quieting disputes and through the statute of limitations closes its civil courts to the complaints of litigants who have not filed suit before a finite period of time has passed. Here plaintiff's vindication, long sought, is occurring through other actions brought in timely fashion and the present effort to resurrect the controvery in this forum was filed too late.

For the reasons discussed, the Court has concluded that the defendants' motion for summary judgment should be and hereby is granted on the grounds that the matters raised in the complaint are barred by the statute of limitations.

So ordered.

---

tionable wrong within the statutory period sufficient to invoke the continuing tort exception.

Moreover, Mr. Mollenhoff's affidavit makes clear that the focal point of the effort to get Mr. Fitzgerald reinstated was "during the three month period from November 1969 through January 1970," when active discussions were going on among numerous members of the White House staff about how the matter could best be handled.

That period was, of course, more than three years prior to the filing of this lawsuit.