A. Ernest FITZGERALD, Appellant,

v.

Robert C. SEAMANS, Jr., et al.

No. 75–1032.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1976.

Decided Feb. 23, 1977.

Rehearing Denied April 29, 1977.

John Bodner, Jr., Washington, D.C., with whom John F. Bruce, William L. Sollee and Ralph J. Temple, Washington, D.C., were on the brief for appellant. Melvin L. Wulf, New York City, also entered an appearance for appellant.

John M. Kelson, Atty., Dept. of Justice, Washington, D.C., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U.S. Atty., Morton Hollander and William Kanter, Attys., Dept. of Justice, Washington, D.C., were on the brief for appellees.

Before LEVENTHAL and WILKEY, Circuit Judges, and BRYAN,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

The District Court found the three year statute of limitations barred the maintenance of a damage action against officials of the Air Force and the Executive Branch for participation in a conspiracy to deprive plaintiff of his civilian position with the Air Force and his constitutional rights, *Fitzgerald v. Seamans*, 384 F.Supp. 688 (D.D.C. 1974). We affirm summary judgment in favor of the Department of Defense appellees; we remand for further factual development the action against the named White House defendant.

## I. SUMMARY OF PROCEEDINGS

Appellant A. Ernest Fitzgerald was Deputy for Management Systems in the Office of the Assistant Secretary of the Air Force for Financial Management from September 20, 1965 until termination of his employment on January 5, 1970. His responsibility was cost analysis of major weapon systems acquisition. On November 13, 1968, Fitzgerald testified on military procurement cost problems before the Subcommittee on Economy in Government of the Joint Economic Committee of Congress. His testimony was notable for his revelation of a potential $2 billion cost overrun on the C–5A transport plane. On November 4, 1969, Fitzgerald was notified that his job had been abolished in a reduction in force, economy reorganization, a termination that became effective January 5, 1970.

Fitzgerald appealed this termination to the Civil Service Commission (CSC) in a letter dated January 20, 1970. He complained that he had been the victim of a discharge improperly motivated by his congressional testimony, entitling him to reinstatement and back pay. The CSC began closed hearings on the appeal on May 4, 1971. Fitzgerald demanded open hearings; this was refused. He sought and obtained an injunction against closed hearings, *Fitzgerald v. Hampton*, 152 U.S.App.D.C. 1, 467 F.2d 755 (1972). Public hearings were held between January 26 and May 3, 1973. On September 18, 1973, the CSC Chief Appeals Examiner issued a decision that Fitzgerald be reinstated to his original or an equivalent job, with back pay, based on the Examiner's finding:

that the agency's decision to abolish Mr. Fitzgerald's position and to include him in the Project 703 reduction-in-force improperly resulted from and was influenced by reasons purely personal to the appellant; and was for the purpose of

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

terminating his employment with the Air Force.[1]

This decision was not appealed and thus became binding. Effective December, 10, 1973, Fitzgerald was reinstated and simultaneously reassigned, back in the Office of the Assistant Secretary of the Air Force for Financial Management, but in a different position, as Deputy for Productivity Management.[2]

On January 25, 1974, Fitzgerald filed suit in the district court for $500,000 in compensatory damages and $3,000,000 in punitive damages, alleging a conspiracy to deprive him of constitutional and statutory rights resulting in permanent injury to his career and personal injury to his dignity, privacy, and reputation, as well as mental anguish.

■ The parties agree that the statute of limitations applicable to this case is that of D.C.Code § 12–301(8) (1973), which establishes a three year limitations period for actions not otherwise enumerated. The District Court agreed, citing *Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App. D.C. 69, 84, 478 F.2d 979, 994 (1973).[3] We affirm that ruling.

To avoid the limitations bar, more than three years having elapsed between his discharge and the filing of his action, appellate advances three grounds for exception to operation of the statute of limitations: (1) realization of injury from a past wrong, for harm which was too speculative at the time of the wrong to be actionable, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); (2) fraudulent concealment of the cause of action, *Holmberg v. Armbrecht*, 327 U.S. 392,

66 S.Ct. 582, 90 L.Ed. 743 (1946); and (3) continuing conspiracy to deny appellant employment and to cover up the conspiracy.

## II. ALLEGATIONS

The defendants moved in the district court for summary judgment on the basis of affidavits and a statement of material facts as to which there is no genuine issue. In opposition, plaintiff responded with affidavits, principally his own, and a statement of genuine issues. *Donofrio v. Camp*, 152 U.S.App.D.C. 280, 283, 470 F.2d 428, 431 (1972).

■ In order to determine whether there is any dispute which makes summary judgment improper, on any of the three asserted theories, we review appellant's allegations as reflected in his affidavits. The rule is that his affidavits must be taken as true— with all disputes resolved in favor of the party opposing summary judgment. His affidavits ran as follows:

*Fitzgerald's Affidavits*

Fitzgerald testified before the Subcommittee on Economy in Government at the request of its chairman, Senator William Proxmire. The Air Force reluctantly agreed to his appearance as a backup witness, with no prepared text. He disclosed the potential for a $2 billion cost overrun on the C–5A transport plane.

After his testimony, Fitzgerald was socially and professionally ostracized at the Pentagon. Many of his tasks and functions were removed, including most of his C–5A responsibilities, and he was given no signifi-

---

1. Decision of CSC Chief Appeals Examiner, September 18, 1973 at 19–20.

2. Fitzgerald appealed this reassignment as not in compliance with the CSC recommendation and constituting an adverse personnel action. The CSC denied the appeal without a hearing. On appeal to the district court, the case was remanded for hearings on the issue of job equivalency. *Fitzgerald v. Hampton*, 383 F.Supp. 823 (D.D.C.1974). The CSC Appeals Office held hearings in June 1975. On June 18, 1976, the CSC Chief Appeals Officer found that the reassignment was in compliance with the

September 18, 1973 directive. This decision is being appealed to the district court.

3. Where a federal cause of action does not contain its own statute of limitations, the analogous local limitations period is grafted on as a general rule. *Johnson v. Railway Express Agency*, 421 U.S. 454, 462, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *United Automobile Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 701–05, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Fitzgerald v. Seamans, supra*, 384 F.Supp. at 690.

cant new assignments. Two months after his testimony, on January 6, 1969, a memorandum was prepared by John Lang, Administrative Secretary to the Secretary of the Air Force, outlining three ways "which could result in Mr. Fitzgerald's departure." One of these ways was the reduction-in-force method which was later put into effect. Fitzgerald became aware of this memo two days later when his superior showed it to him to indicate that he was "no longer useful" to the Air Force, as a result of his testimony and the ensuing publicity. In late May and early June of 1969, Fitzgerald testified four times before the House Armed Services Committee and the Joint Economic Committee at their request.

On May 7, 1969, appellee Robert Seamans, Secretary of the Air Force, told the House Armed Services Committee in closed session of his dissatisfaction with Fitzgerald's work and accused him of leaking "confidential documents" to members of Congress, as well as spending government time on other than official duty, i. e., talking to Congress. Six months later, in hearings on Fitzgerald's dismissal by the Subcommittee on Economy in Government of the Joint Economic Committee, Secretary Seamans partially retracted the leakage charge, indicating that there had been no security violation, but rather than his concern was with following proper channels for transmitting information to Congress.

In May, 1969, an investigation of Fitzgerald was begun by appellee General Joseph Cappucci, Director of Special Investigations in the Air Force. Various Air Force employees who knew Fitzgerald were interviewed and made nonspecific derogatory statements about him. The only specific charge—a conflict of interest through continued ownership of stock in Performance Technology Corporation, a consulting firm on weapons system management which Fitzgerald founded before joining the Air Force—was not substantiated and dropped. In November, 1969, Congressman William Moorhead became aware of the investigation file and requested to see it. The file provided to him (and later to Senator Prox-

mire) contained only the four derogatory interviews (with the informants' identities deleted). Missing from the file as thus transmitted were the general background material that had been compiled and the statement of Leonard Marks, Fitzgerald's former superior as Assistant Secretary of the Air Force, which was favorable to Fitzgerald and cleared him of any conflict of interest.

In June, 1969, appellee Spencer Schedler became Fitzgerald's supervisor as Assistant Secretary of the Air Force for Financial Management. At about the same time, Fitzgerald met with then Secretary of Defense, appellee Melvin Laird. Laird told Fitzgerald that he had become "a personnel problem" and that the incoming Assistant Secretary Schedler would be allowed to reorganize his office and pick his deputies. This made it clear to Fitzgerald that his employment would soon be terminated. RIF Project 703 carried out the reduction in force in the fall of 1969 and Fitzgerald's position was abolished. He was informed of this termination on November 4, 1969, to be effective January 5, 1970.

Appellees Seamans, Schedler, and Laird contacted Congressmen and Senators in November, 1969 in response to the reaction to Fitzgerald's layoff. Seamans and Schedler explained that it was due to Fitzgerald's not being "a team player." Secretary Laird stated in testimony to the House Appropriations Committee that Fitzgerald had been "fired" although his C–5A estimates were correct.

On January 20, 1970, Fitzgerald appealed his termination to the Civil Service Commission. The pursuit of this appeal through reinstatement, reassignment, and contest of the equivalency of the reassignment has been set out, *supra* note 2. What is significant for present purposes is that all the allegations set out above are substantially contained in Fitzgerald's CSC appeal letter, including the charge that he was illegally fired in retaliation for his November, 1968 testimony on the C–5A and that he had been harassed and intimidated by Air Force officials.

*White House Staff Involvement*

In the course of the CSC hearings held between January 26 and March 3, 1973, indications appeared of White House involvement in Fitzgerald's dismissal. Secretary Seamans refused to discuss conversations he had had outside of the Department of Defense, invoking executive privilege. However, he inadvertently testified that "I did receive advice from the White House at some period prior to Mr. Fitzgerald's job being abolished." [4]

Immediately after the announcement of Fitzgerald's dismissal in November, 1969, Clark Mollenhoff, then Deputy Counsel to the President, began investigating the reasons and justification for the dismissal, in his role as ombudsman and because of the adverse political consequences if the dismissal were not publicly justified. Mollenhoff met with Assistant Secretary of the Air Force Schedler and Schedler's assistant, Colonel James Pewitt. They gave as reasons for getting rid of Fitzgerald the "not a team player" characterization and unspecified charges of security violations and conflict of interest. Mollenhoff was promised a report spelling out the charges against Fitzgerald, but it never materialized. Thereafter, Mollenhoff wrote intra-White House memoranda calling attention to the Air Force's misjudgment of the case against Fitzgerald. Mollenhoff advocated that, unless a strong case of Fitzgerald's professional deficiencies could be made, the embarrassment of appearing to persecute Fitzgerald for his testimony be avoided by finding him another responsible post in the Defense Department.

On August 31, 1973, in the course of the Watergate hearings of the Senate Select Committee on Presidential Campaign Activities, a memorandum written by appellee Alexander P. Butterfield on January 20, 1970 was made public. In January, 1970, Butterfield was Deputy Assistant to the President, serving as an aide to H. R. Haldeman, White House Chief of Staff. Prior to taking that position, he had been an Air Force officer for 19 years. The memorandum to Mr. Haldeman, with copies to other well-known White House officials, presented Butterfield's opinion of Fitzgerald as a "basic nogoodnik," who "*must* be given very low marks in loyalty." Fitzgerald Affidavit, July 22, 1974, Attachment G. The memorandum recommended:

> We should let him bleed, for a while at least. Any rush to pick him up and put him back on the Federal payroll would be tantamount to an admission of earlier wrong-doing on our part.

*Id.*

*Continuing Air Force Hostility*

After Fitzgerald was ordered reinstated by the CSC on September 18, 1973, he met with Assistant Secretary on the Air Force William Woodruff to discuss his restoration. Woodruff told Fitzgerald that he was returning "under a cloud" and that it was up to him to "remove the stigma" he bore. To remove the stigma, Woodruff said Fitzgerald would have to gain the acceptance of the staff, including his "enemies" Generals Larry Killpack and Duward Crow, the latter being Comptroller of the Air Force and an appellee in this case.[5] Fitzgerald characterizes these statements, as well as his immediate transfer upon reinstatement in December, 1973, as continuing retaliatory action by certain Air Force officials.

## III. BASIS OF ACTION

We say a few words about the basis of appellant's action, although we intend no ruling whatever on the merits, because it aids in understanding our rulings on the limitations issue, particularly in relation to the claim, discussed in section IV A, *infra*, that the policy underlying the present action calls for application of the *Zenith* doctrine, which in effect permits a deferral of suit until damages crystallize.

Suit was brought on the bases of: 1) an implied cause of action for constitutional violations by governmental officials, 2) an action based on 42 U.S.C. §§ 1985(3) and

---

4. Fitzgerald Affidavit, July 22, 1974 at 46, 54, App. 61, 69.

5. Fitzgerald Affidavit, July 22, 1974 at 54–55, App. 69–70.

1986, and 3) the common law of torts, including injury to plaintiff's reputation, dignity, privacy, and career as well as causing him mental distress. No answer has been filed.

One issue that would arise on the merits is whether plaintiff's action meets the requirement for an action based on section 2(3) of the Klu Klux Klan Act of 1871, now 42 U.S.C. § 1985(3), "that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

Another issue is the applicability of the doctrine of official immunity, either as an absolute immunity under *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), or a qualified immunity by extension of *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).[6]

In view of these difficulties confronting plaintiff's civil action for damages, not least the defense of official immunity, it is hardly surprising that counsel seeking to vindicate Fitzgerald focused on the direct proceeding for reinstatement and backpay. The availability of that administrative remedy is not a reason for failing to consider plaintiff's claim for judicial relief, if timely filed, but neither, as we shall point out, is it a reason for unusual solicitude in order to accommodate the late filing or forge novel exceptions to the statute of repose.

## IV. TOLLING THE STATUTE OF LIMITATIONS

### A. *CSC Appeal and Zenith Argument*

Appellant does not argue that his filing of an appeal with the Civil Service Commis-

sion and pursuant of an administrative remedy tolls the statute of limitations as it applies to this tort—civil rights damages action.[7] However, he does argue that the CSC proceeding is material to the scope of the damages action, and thus to the issues as to when the action accrued and his diligence in pursuing it. Appellant puts it that when he undertook his CSC appeal, he expected that he would be speedily made whole in his job and reputation, as well as back pay. He could not anticipate the long delay due to the appeal of the CSC's closed hearing decision. Due to his long layoff, under a cloud of accusations by some of the appellees, and his reassignment to a nonequivalent position (outside of his specialty of major weapons systems cost control), his career was permanently injured in a way not remediable by the CSC. In effect, appellant argues that his present suit is for the residual damage unremedied by the CSC. Since this residue only accrued during the pendency of the first CSC proceeding, between 1970 and 1973, the cause of action only accrued then, making appellant's complaint in January, 1974 timely.

■ The trouble with this theory is twofold: 1) it confuses the wrong and the injury; 2) it overlooks the fact that whatever cause of action appellant may have here, it is independent of the CSC remedy and thus cannot "accrue" as a residuum depending on the timing and outcome of the administrative appeal. We first discuss the second of these points.

Since appellant had the option to bring an action for the harm done to him by appellees concurrently with his recourse to

---

**6.** Plaintiff's action is grounded on the assumption that defendants' actions were beyond "the outer perimeter of [their] line of duty." *Barr*, 360 U.S. at 575, 79 S.Ct. at 1341. Plaintiff's action was filed before *Rhodes* issued, and we need not concern ourselves with the abstract possibility that *Rhodes* gave a new lease on life to actions that had previously been barred. To the extent the action was not time-barred when filed, plaintiff may contend that *Rhodes* defines the defense of immunity, and makes that de-

fense available only to one who shows a reasonable, good faith belief in the legality of his actions. There may be a difference, in applicability of *Rhodes*, between the federal actions and the common law action.

**7.** *See Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Intl. U. of Electr. Radio & Mach. Workers v. Robbins & Myers*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976).

the CSC,[8] he cannot now untimely invoke the judicial remedy because the administrative one does not make him whole. The choice of whether to pursue one remedy or the other, or both, may be difficult, but Fitzgerald had the choice, and was not barred from the damages action by an exhaustion requirement.[9] There was no guarantee that the CSC route would be successful, speedy, or complete. But the administrative and judicial remedies were independent. And the limitations period ran on the judicial remedy independently of the CSC proceeding.

■ We turn to appellant's reliance on *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). In that antitrust action, the Supreme Court allowed suit for treble damages for profits lost within the four years limitations period prior to the filing of the action, though arising from conspiratorial conduct at some prior time, where an action brought at the time of the wrongful conduct could not have recovered the future profits because the existence and amount of future profits were too speculative.[10] Appellant argues, by analogy, that he could not anticipate that the CSC proceeding would not quickly make him whole and avoid prolonged interference with his career development. Thus, even if the wrong

was fully accomplished by the time of his dismissal, the harm that emerged in the succeeding years was too speculative to recover on in advance, so that he should now be able to recover for the damage suffered in the three years preceding the filing of the complaint in 1974.

The *Zenith* doctrine arose in and has been confined to the area of antitrust treble damage recovery for lost profits. The *Zenith* exception to the statute of limitations is necessitated by the intersection of the traditional requirement of reasonable certainty of proof of lost profits and the strong congressional policy in favor of antitrust enforcement by private damage suits.[11]

Neither of these factors is here present. Assuming appellant does have a cause of action, it is based on deprivation of civil rights and injury to reputation and career. These matters are inherently less certain and capable of pecuniary evaluation than lost profits. There is often uncertainty as to the damage that will ensue from a defamation, yet the statute of limitations generally starts running with the publication. Appellant was aware of wrongs done at the time of his discharge, and the fact of injury was sufficiently plain for his cause of action to accrue even though the extent and precise nature of the injury had not yet developed.

---

**8.** *See* cases cited in note 7, *supra. See also Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).

**9.** We recognize, too, that the filing of a lawsuit might tend to deter efforts at conciliation, that lack of success in the legal action could weaken the Commission's efforts to induce voluntary compliance, and that a suit is privately oriented and narrow, rather than broad, in application, as successful conciliation tends to be. But these are the natural effects of the choice Congress has made available to the claimant by its conferring upon him independent administrative and judicial remedies. The choice is a valuable one. Under some circumstances, the administrative route may be highly preferred over the litigatory; under others, the reverse may be true.

*Johnson, supra,* 421 U.S. at 461, 95 S.Ct. at 1720.

**10.** In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.

*Zenith, supra,* 401 U.S. at 339, 91 S.Ct. at 806.

**11.** Otherwise future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose that private actions serve "as a bulwark of antitrust enforcement," and that the antitrust laws fully "protect the victims of the forbidden practices as well as the public."

*Zenith, supra,* 401 U.S. at 340, 91 S.Ct. at 807 (citations omitted).

B. *Fraudulent Concealment*

■ Read into every federal statute of limitations, including the adoption of an analogous local statute of limitations, is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit. *Holmberg v. Armbrecht,* 327 U.S. 392, 396–97, 66 S.Ct. 582, 90 L.Ed. 743 (1946), *Tomera v. Galt,* 511 F.2d 504, 510 (7th Cir. 1975). This discovery of facts standard (with a diligence requirement) has been applied, for example, in securities cases dealing with fraudulent or deceptive practices,[12] and in medical malpractice cases,[13] where the "concealment" element is particularly supported by the combination of fiduciary relation and layman's reliance on experts. We have also applied the discovery-diligence standard where an employer, charged with violating the duty to bargain in good faith, has deliberately misstated its business intentions.[14]

■ We think it appropriate to apply the discovery-diligence standard to this case, where appellant alleges there was a conspiracy to terminate his government service in retaliation for his congressional testimony, and to conceal this by making false accusations to besmirch his reputation and by perpetrating the termination in the guise of a reduction in force. In the particular case, there is the "aggravation" that appellant has been impeded in exploring the circumstances of his dismissal and its aftermath by invocation of governmental secrecy, *e. g.,* the confidential investigation conducted by General Cappucci, based on statements of unidentified informants, and the invocation of executive privilege in the CSC hearings with respect to communication with the White House. *Compare Crummer Co. v. DuPont,* 255 F.2d 425 (5th Cir.), *cert. denied,* 358 U.S. 884, 79 S.Ct. 119, 3 L.Ed.2d 113 (1958), applying the discovery standard to an alleged antitrust conspiracy accomplished by "fraudulent use by the appellees of the governmental bodies whose investigations are by law largely kept secret . . . .." *Id.* at 432. This discovery standard tends to obviate the danger that dismissed government employees will rush to litigation on bare suspicion that superiors acted in bad faith and outside the perimeter of their duties.

However, we disagree with appellant on the proper application of the discovery doctrine to the present case. We agree with the district court that Fitzgerald's appeal letter to the CSC demonstrates that, by 1970, he had facts in hand sufficient to put him on notice of the conspiracy by the Air Force appellees to retaliate against him for his congressional testimony. He not only had a strong suspicion of the "real" reason for his termination, he knew that immediately after his testimony he was ostracized within the Air Force, his duties were shifted, and he was given no new responsibilities; he knew of the Hicks memorandum which showed that the RIF was only a stratagem for accomplishing his removal; he knew of the investigation of him by

---

12. *Tomera, supra,* 511 F.2d at 510 (fraudulent concealment by failure to keep records or provide information about business); *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith,* 494 F.2d 168, 172 (10th Cir. 1974) (no summary judgment on issue of plaintiff's constructive knowledge of fraudulent "churning"); *Hupp v. Grey,* 500 F.2d 993, 996–97 (7th Cir. 1974) (drastic drop in stock price provided sufficient notice of possibility of fraud to start statute running).

13. *Emmett v. Eastern Dispensary & Casualty Hospital,* 130 U.S.App.D.C. 50, 396 F.2d 931 (1967); *Jones v. Rogers Memorial Hospital,* 143 U.S.App.D.C. 51, 442 F.2d 773 (1971); *Casias v. U. S.,* 532 F.2d 1339 (10th Cir. 1976); *Goodman v. Mead Johnson,* 534 F.2d 566 (3rd Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977); *Nardone v. Reynolds,* 538 F.2d 1131 (5th Cir. 1976); *Camire v. U. S.,* 535 F.2d 749 (2nd Cir. 1976).

14. *Intl. Ladies' Garment Workers U. v. NLRB,* 150 U.S.App.D.C. 71, 80, 86, 463 F.2d 907, 916, 922 (1972). *See also,* applying the discovery standard to civil rights actions with medical overtones, *Cox v. Stanton,* 529 F.2d 47, 50 (4th Cir. 1975) (sterilization); *Pollard v. U. S.,* 384 F.Supp. 304, 308 (M.D.Ala.1974) (wrongful death from syphilis study).

General Cappucci, and the false charges of inadequate job performance, security violations, and conflicts of interests that were made against him to Congress, both in the 1969 testimony by Secretary Seamans and by accusations in the investigatory file provided to Congress. In view of the diligence feature of the discovery doctrine, this was sufficient to put appellant on notice of the conduct by some Air Force officials which is now asserted as the basis for the lawsuit.[15]

Appellant claims not to have known at the time of the CSC appeal letter of the conspiracy against him, and to have only later learned the identities of some of the conspirators and the meetings held concerning him. The CSC appeal letter does not use the words of conspiracy. What matters is that appellant knew of facts and actions pointing toward retaliation by the Air Force for his congressional testimony.

■ Our affirmance of the summary judgment in favor of the defendants includes all the Air Force officials, including Colonel Hans Driessnack, whose identity as an informant in General Cappucci's investigation was not known to appellant three years before the complaint was filed. Appellant had failed to bring timely action against the higher Air Force and Defense officials, although he knew of their actions and statements and had at least constructive knowledge of grounds for the late lodged suit; it would be anomalous and unjust to allow appellant to begin an action against lesser fry merely because their identity and participation were earlier unknown. The matter would stand differently if appellant had proceeded with diligence within the 3-year period by suing those conspirators known to him at the time, and later sought to add other participants whose identity he learned in the course of that suit.

A different situation prevails with respect to appellee Butterfield. He is not lesser fry in the Air Force, but a person of influence in a different center of power. Nothing in the CSC letter indicates that appellant had any knowledge of any White House involvement in his removal. Fitzgerald's CSC appeal letter and Butterfield's memorandum bear the same date—January 20, 1970. The papers before us do not compel any ruling that as a matter of law Fitzgerald should have become aware prior to 1973 of the White House deliberations concerning his government employment. When he finally succeeded in vindicating his right to an open CSC hearing, he was met with the assertion by the Air Force witness of executive privilege with the respect to White House involvement. Butterfield's role emerged by happenstance during the Watergate hearings. Summary judgment for Butterfield on the ground of statute of limitations cannot stand. This implies no view on whether further factual development may show that with diligence plaintiff should have known of White House involvement; or whether Butterfield's opposition to moves within the White House to find another government job for Fitzgerald is an actionable wrong; or whether he has an immunity defense. Those are issues on the merits, and we only reverse the summary judgment that the action against Butterfield is time-barred.[16]

### C.  Continuing Conspiracy

■ Appellant seeks to avoid the limitations bar by characterizing appellees' ac-

---

**15.** *Compare* the summary judgment for the defendant on the basis of limitation on a monopolization claim over the plaintiff's fraudulent concealment contention in *Weinberger v. Retail Credit Co.,* 498 F.2d 552 (4th Cir. 1974).

> In short, while RCC may have concealed its alleged monopolistic position from numerous persons during this period, its "deceptive practices and techniques of secrecy" effectively concealed very little from Weinberger. He knew he had been injured, who was responsible, how the injury occurred, and the

methods utilized to prevent him from discovering the injury.
*Id.* at 556.

**16.** Appellant's complaint named nine defendants and in addition "Other Persons, Including But Not Limited To One Or More White House Aides, Whose Identities Are At This Time Unknown To Plaintiff, But Who Are Designated Herein As John Does." If a new defendant were discovered, he could be added, subject to the requirement of due diligence.

tions as part of a continuing conspiracy to deprive him of and to prevent his restoration to his rightful job. He relies chiefly on *Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69, 478 F.2d 979 (1973). We held there that appellant's complaint of racial employment discrimination by an employer and a union constituted an allegation not merely of an early isolated refusal of employment but a continued discriminatory hiring system which denied appellant the right of hiring opportunity on a nondiscriminatory basis. The case was bolstered by appellant's expectation of a job under a prior grievance decision but for the employer's racially motivated business decision.[17] Appellant claims a similar expectation of restoration if his allegations are taken as correct, reinforced by the CSC order of 1973 that he be reinstated in an equivalent position. However, as the district court properly stated, *Fitzgerald v. Seamans,* 384 F.Supp. at 697, the mere failure to right a wrong and make plaintiff whole cannot be a continuing wrong which tolls the statute of limitations, for that is the purpose of any lawsuit and the exception would obliterate the rule.

In treble damage actions involving antitrust conspiracies, the action accrues at the last overt act causing injury.[18] In *Underwater Storage, Inc. v. United States Rubber Co.,* 125 U.S.App.D.C. 297, 371 F.2d 950 (1966), *cert. denied,* 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967), we allowed recovery for use during the limitations period, of a trade secret previously misappropriated, to prevent the misappropriators from

" 'baptiz[ing]' their wrongful actions by general publication of the secret." *Id.* at 302, 371 F.2d at 955. This approach to limitation of civil conspiracies has been adapted to civil conspiracies to violate civil rights. *Hoffman v. Halden,* 268 F.2d 280, 302 (9th Cir. 1959), *overruled on other grounds, Cohen v. Norris,* 300 F.2d 24, 30 (9th Cir. 1962).[19]

■ In the present case, appellant's allegation of a continuing conspiracy is general and conclusory, without specification of any retaliatory actions within the limitations period. In his affidavit of September 16, 1974, appellant alleges failure to be hired by a private employer in 1972 due to the well-known attitude of the Department of Defense toward him. However, no active steps to blackball him are alleged. This would constitute subsequent damage resulting from a past wrong.

■ Appellant claims that the Air Force officials involved in his reassignment in 1973, when he was told that he had to satisfy his "enemies," committed overt acts in the continuing retaliatory conspiracy against him. Even apart from the fact of the almost complete turnover in the Air Force officials involved in Fitzgerald's reassignment in 1973, the allegation raises the claim of a new conspiracy—to disobey and frustrate the carrying out of the CSC order—rather than the original one of getting him out of the Air Force and depriving him of his good reputation by making false accusations. Separate conspiracies may not be characterized as a single grand conspiracy for procedural advantage.[20] Appellant

---

17. *Macklin, supra,* 156 U.S.App.D.C. at 77, 478 F.2d at 987. *See Williams v. Norfolk & Western Ry.,* 530 F.2d 539, 541–42 (4th Cir. 1975) which found continuing discrimination in the deprivation on racial grounds of seniority to railway brakemen dating from a merger fifteen years earlier for those still employed at the commencement of the action, but not for a plaintiff who had retired more than two years (the limitations period) earlier. *Accord, Greene v. Carter Carburetor Co.,* 532 F.2d 125, 126 (8th Cir. 1976).

18. *Compare Pioneer Co. v. Talon, Inc.,* 462 F.2d 1106 (8th Cir. 1972) *with Garelick v. Goerlich,* 323 F.2d 854 (6th Cir. 1963), applying this rule,

but differing on the injuriousness of defendants' refusal to deal.

19. *See also DeBobula v. Goss,* 90 U.S.App.D.C. 28, 29, 193 F.2d 35, 36 (1951); *Mizell v. North Broward Hospital Dist.,* 427 F.2d 468, 475 (5th Cir. 1970); *Bergschneider v. Denver,* 446 F.2d 569 (9th Cir. 1971).

20. *Compare Kottaekos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (hub and spokes conspiracies) *with United States v. Bruno,* 105 F.2d 921 (2nd Cir.), *rev'd on other grounds,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939) (functionally related parts of a chain of distribution, single conspiracy). *See*

might have a cause of action for any conspiracy to prevent his reemployment by the Air Force in good standing. However, that would not serve to save the appellant's action for damages caused by the earlier conspiracy. A key issue in any claim of a 1973 conspiracy would be the equivalency of the job to which he was now reassigned, an issue now before the district court.[21]

The action against appellee Butterfield is remanded for further proceedings not inconsistent with this opinion. As to all other appellees the judgment is affirmed.

*So ordered.*

---

*also United States v. Borelli,* 336 F.2d 376, 383 n. 2 (2nd Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

21. *See* note 2, *supra.*