**Apostolos KAKAES, Appellant,**

v.

**The GEORGE WASHINGTON UNIVERSITY, Appellee.**

**No. 94–CV–1046.**

District of Columbia Court of Appeals.

Argued March 26, 1996.

Decided Sept. 26, 1996.

■

Thomas J. Gagliardo, for appellant.

Curtis A. Ritter, with whom Mary K. Qualiana and Sadhna Govindarajulu, Washington, DC, were on the brief, for appellee.

Before FERREN, STEADMAN, and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

Dr. Apostolos Kakaes brought this action in the Superior Court against George Washington University, alleging that the University had unlawfully refused to grant him tenure. He claimed that the University failed to provide him with timely notice of a final and definitive denial of his application for a tenured appointment, as required by the University's Faculty Code.[1] The trial judge granted the University's motion for summary judgment. We reverse.

### I.

### BACKGROUND

In September 1987, the University appointed Dr. Kakaes to its faculty as an Assis-

---

1. The parties agree that Dr. Kakaes' employment contract incorporated the provisions of the Faculty Code. We therefore sometimes refer to the Faculty Code as the contract.

tant Professor in the Department of Electrical Engineering and Computer Science ("EECS") within the School of Engineering and Applied Sciences ("SEAS"). The appointment was "tenure-accruing," which meant that Dr. Kakaes would eventually be eligible for consideration for tenure. On June 28, 1993, the University notified Dr. Kakaes by letter that "you will not be granted tenure at the conclusion of your current appointment." The notice went on to state, however, that the matter would be submitted to the Board of Trustees and that "[y]ou will be notified of the outcome as soon as possible." This case turns on the question whether the foregoing notice, which Dr. Kakaes received prior to any decision by the Board of Trustees, adequately apprised Dr. Kakaes, as required by the Faculty Code, that he "will not be granted tenure."

### A. The Faculty Code.

A proper understanding of this somewhat esoteric dispute requires familiarity with the applicable provisions of the Faculty Code. The Code provides that "Assistant Professors shall be appointed for a period of not more than three years and may be reappointed, with or without tenure, for one or more additional periods." Code § IV.A.4.1.b. "All appointments or reappointments to regular, active-status positions, [except for those that confer tenure], shall be for a specified term." Code § IV.A.3.1.a. The total of such terms, however, "shall not exceed seven years." Code § IV.A.3.1.b. Under the Code, therefore, the professor's employment is terminated if tenure is not granted after seven years.

Decisions regarding tenure "shall normally follow faculty recommendations," unless the University administration "nonconcurs" and offers "compelling reasons" for its nonconcurrence. Code Procedures § B.3.[2] In the event of nonconcurrence, "[v]ariant or nonconcurring recommendations" by the administration are referred to the Executive Committee of the Faculty Senate, which "may seek information and advice and make recommendations to the faculty or the appropriate unit thereof and to the appropriate administrative officers." Code Procedures

§ B.4. Some attempt to achieve consensus between the faculty and the administration is apparently contemplated, but

[i]f concurrence cannot be obtained after opportunity for reconsideration in light of the recommendations of the Executive Committee, the recommendations of the appropriate administrative officers, accompanied by the recommendation of the faculty and the report of the Executive Committee, shall be transmitted to the Board of Trustees through the President.

*Id.*

The Code also contains a notice provision which states, in pertinent part, that

[a] faculty member of the rank of assistant professor or higher who will not be granted tenure at the end of the final year of his or her maximum term of appointment shall be so notified in writing no later than June 30 preceding the year in which his or her appointment will expire.... Any such faculty member who is not so notified shall acquire tenure at the end of the term.

Code § IV.A.3.1.c. Dr. Kakaes' principal contention is that the University failed to comply with this provision.

### B. Dr. Kakaes' Tenure Application.

In September 1992, at the beginning of the sixth year of his maximum term of appointment, Dr. Kakaes submitted an application for tenure and promotion to the EECS Personnel Committee. In November 1992, the Personnel Committee unanimously recommended to the Dean of the SEAS, Gideon Frieder, that Dr. Kakaes be granted tenure and promotion. Dean Frieder, however, disagreed, and after explaining the reasons for his nonconcurrence, he requested the Personnel Committee to reconsider its recommendation. On March 24, 1993, the Committee met to consider Dean Frieder's request, but again voted to recommend that Dr. Kakaes receive a tenured appointment. The views of the Personnel Committee and of Dean Frieder were thus in conflict.

On May 14, 1993, with the impasse still unresolved, the University's Vice President

2. "Code Procedures" stands for "Procedures for the Implementation of the Faculty Code."

for Academic Affairs, Roderick French, advised Dr. Kakaes by letter that Kakaes had been reappointed for the 1993–94 academic year. Dr. French further advised Dr. Kakaes that he would be notified by June 30, 1993 whether he had been recommended to the Board of Trustees for reappointment with continuous tenure.

On May 15, 1993, Dean Frieder formally notified Vice President French that he did not concur with the recommendation of the EECS Personnel Committee. Vice President French conveyed Dean Frieder's nonconcurrence to the Executive Committee of the Faculty Senate. On June 21, 1993, after reviewing Dr. Kakaes' application, the Executive Committee concluded that Dr. Kakaes should not be granted tenure. In the Executive Committee's view, Dean Frieder had presented compelling reasons for his nonconcurrence with the Personnel Committee's recommendation. The Executive Committee requested the Personnel Committee to withdraw its recommendation in Dr. Kakaes' favor. At a September 1993 meeting, however, the Personnel Committee adhered to its original position, and the impasse between Dr. Kakaes' faculty colleagues and the University administration remained unresolved.

Meanwhile, by letter dated June 28, 1993,[3] Vice President French notified Dr. Kakaes that

> [i]n accordance with section IV.A.3.1.c of the *Faculty Code,* I am notifying you that *you will not be granted tenure at the conclusion of your current appointment.* This is due to the fact that your dean did not concur with the departmental recommendation regarding tenure. Consistent with sections B.3 and 4 of the [Code Procedures], I referred the matter to the Executive Committee of the Faculty Senate for its consideration. *The President and I are in the process of transmitting the report of the Executive Committee to the Board of Trustees for its consideration. You will be notified of the outcome as soon as possible.*

(Emphasis added). On the same day, Vice President French advised the chairman of the EECS department by memorandum that

> [o]n advice of counsel, I have sent [a letter] to [Dr. Kakaes] informing [him] that as of this date [he has] not been awarded tenure at the conclusion of [his] current contract.... *By so informing [Dr. Kakaes], the question of [his] ultimate tenuring or termination remains to be resolved....* I trust you would agree that faculty should be awarded tenure only by virtue of *affirmative action by the Board of Trustees.* For a variety of reasons, this was not possible to accomplish ... this year by June 30th....

(Emphasis added).

On September 7, 1993, the University's Assistant Vice President for Legal Matters advised Dr. Kakaes' attorney that "there ha[d] not yet been any final action regarding Professor Kakaes." On December 1, 1993, Stephen Trachtenberg, the President of the University, transmitted Dr. Kakaes' tenure file to the Chairman of the Board of Trustees. President Trachtenberg stated in his letter of transmittal that he believed that the matter required review by the Board.

On February 10, 1994, seven months after Dr. Kakaes received the purported notice of non-renewal, the Board of Trustees voted to uphold Dean Frieder's nonconcurrence, thereby denying Dr. Kakaes' application for tenure.

## C. The Proceedings in the Trial Court.

On October 22, 1993, more than three months prior to the action of the Board of Trustees, Dr. Kakaes filed this suit against the University in the Superior Court, alleging breach of contract. Dr. Kakaes prayed the court, *inter alia,* for declaratory relief and for an order requiring the University to grant him tenure. Dr. Kakaes alleged that he was entitled to tenure because Vice President French's letter of June 28, 1993 was legally insufficient to constitute the required notice that tenure will not be granted. He alleged that the Board of Trustees had not acted on his tenure application, that no final decision regarding tenure had as yet been made, and that therefore "the notice require-

---

**3.** Dr. Kakaes received the letter on June 30, 1993.

ments of Sections V.B.1.c and IV.A.3.1.c of the Faculty Code ha[d] not and could not have been ... complied with."

After conducting substantial discovery, the parties filed cross-motions for summary judgment. In an order filed on July 5, 1994, the trial judge held, *inter alia*, that "[n]owhere in the Code does ... a requirement [exist] that the notice of a denial of tenure not be given until the Board of Trustees ha[s] acted." Apparently concluding that the Faculty Code was unambiguous and that the notice which the University had provided to Dr. Kakaes complied with the Code as a matter of law, the judge granted the University's motion for summary judgment and denied Dr. Kakaes' motion. This appeal followed.

## II.

## LEGAL ANALYSIS

*A. Scope of Review.*

■ The question whether the trial court properly granted summary judgment in favor of the University[4] is one of law. Accordingly, our consideration of that question is *de novo*, and we must undertake an independent review of the record to determine whether the University has shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See, e.g., Holland v. Hannan*, 456 A.2d 807, 814–15 (D.C.1983).

■ "In the area of contract interpretation, the existence of a genuine issue of material fact generally turns on whether or not the contract is ambiguous." *Gryce v. Lavine*, 675 A.2d 67,69 (D.C.1996). The University is therefore entitled to summary judgment if, and only if, the Faculty Code unambiguously supports the University's interpretation. *Id.*

*B. The Faculty Code.*

■ The University contends, and the trial judge effectively held, that Vice President French's letter was sufficient, as a matter of

law, to satisfy the University's contractual obligations. We disagree.

■ Words in a contract "are to be given their common meaning." *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977) (per curiam); *see also Sawyer v. Mercer*, 594 S.W.2d 696, 699 (Tenn.1980) (applying this principle to language in a faculty guide). The Faculty Code provides that a member of the faculty *"who will not be granted tenure* ... shall be so notified in writing no later than June 30...." Code § IV.A.3.1.c (emphasis added). An impartial trier of fact could reasonably conclude that the words "will not," as used in this context, presuppose that a final and definitive decision has been made with respect to tenure prior to the notice being given. The Code does not state that the faculty member is to be notified that he "may not" be granted tenure, or that he "is not likely to" be granted tenure, or that he "has not been recommended for" tenure. The operative words are *"will not."* A reasonable person could find, in this context, that "will not" means "will not," not something less definitive, and that a "predictive" notice is not sufficient.

The University reads the notice provision as though it stated: "If the Dean recommends that tenure be denied, then the faculty member shall be so notified." According to the University, a recommendation by the Dean that tenure be denied is the event which triggers the notice requirement. It may be that such a provision would be a sensible one and that the University could readily comply with it, but the parties agreed to something quite different. The Code as written contemplates notice of a decision that tenure "will not be granted." The apparent triggering event is not the Dean's nonconcurrence, but a final decision denying tenure.

A definitive decision could not have been made in this case in conformity with the Faculty Code until after the Board of Trustees had acted on Dr. Kakaes' application. Where, as here, the faculty and the administration have disagreed as to whether tenure

---

**4.** We do not address, on this appeal, the question whether the trial court properly declined to grant summary judgment in Dr. Kakaes' favor. "[A]ccording to the general rule applicable here, [the] denial of a motion for summary judgment is not reviewable on appeal, either during the trial ... or after trial." *Hammond v. Weekes*, 621 A.2d 838, 839 n. 1 (D.C.1993) (citations omitted).

should be granted, the Code designates the Board of Trustees as the body to which the offering recommendations are transmitted. Code Procedures § B.4. At each step prior to Board review, the role of the faculty and of the administration is to make "recommendations." The use of the term "recommendations" necessarily means that a final decision has not been made, and it is the body to which the recommendations are transmitted—here, the Board of Trustees—that must determine which recommendation is to be followed.

In the present case, Vice President French's "notice" to Dr. Kakaes was transmitted on June 28, 1993, more than half a year before any action was taken by the Board of Trustees. Moreover, the notice itself reveals the non-final character of the tenure decision. To be sure, French began his letter by advising Dr. Kakaes, in the language of the Faculty Code, that "you will not be granted tenure at the conclusion of your current appointment." The ostensible certitude of this assertion, however, was dissipated by the disclosure, later in the letter, that the matter was being referred to the Board of Trustees "for its consideration" and that Dr. Kakaes "will be notified of the outcome as soon as possible." If the "outcome" was dependent on an action by the Board which was to be taken in the future, then nobody could know for sure, at the time the letter was written, whether or not Dr. Kakaes "*will*" be denied tenure.

The summary judgment record contains further evidence, aside from Vice President French's letter, that the University itself fully understood that the Board of Trustees was to be the final and decisive actor with respect to Dr. Kakaes' application. Dr. French acknowledged in his memorandum of June 30, 1993 to the chairman of Dr. Kakaes' department that "the question of [Dr. Kakaes'] ultimate tenuring or termination *remains to be resolved.*" (Emphasis added). Moreover, as we have noted, the non-finality of the Dean's recommendation was subsequently acknowledged by counsel for the University and by President Trachtenberg. See pp. 131–132, *supra.*[5]

The University argues that the Board of Trustees has never declined to follow a non-concurring recommendation forwarded by the Dean, and that "predictive" notice which is sent prior to review by the Board is therefore sufficient as a matter of law. The contention that the Board automatically and uncritically approves the recommendations of administration officials, however, does not square with the language of the Code. The Code Procedures provide that nonconcurring "recommendations" (rather than "decisions") "shall be transmitted to the Board of Trustees." By the terms of the contract, then, the Board played a significant role in the tenure review process. Specifically, the Board was designated to make the final decision as to tenure when the administration and the faculty were unable to reach a consensus. In this case, as in *Kyriakopoulos v. George Washington Univ.*, 275 U.S.App. D.C. 237, 243, 866 F.2d 438, 444 (1989), "the contract does not transmogrify the Board into a rubber stamp of committee [6] decisions." [7] Further, in *Kyriakopoulos*, the court recognized the "traditional discretion reserved to the Trustees" and observed that the Board need not "mechanically accept the committees' recommendations." *Id.* It is not for this court

---

5. In 1993, the University was in the process of eliminating the Board from the tenure review process. This had not been accomplished, however, at the time of the decisive events in this case. As Vice President French stated in a September 27, 1993 memorandum to President Trachtenberg, "for legal reasons, these cases that are holdovers from last spring [including Dr. Kakaes' case] will have to go through my committee up to the Board."

6. In *Kyriakopoulos,* the quoted language referred to decisions of the Faculty Senate Hearing and Grievance Committees. It is worth noting that *Kyriakopoulos* also involved a dispute over a pro-

fessor's request for promotion at the University's School of Engineering and Applied Sciences, and that in that case the Board of Trustees most assuredly did not act as a mere rubber stamp.

7. The summary judgment record reinforces this understanding of the Board's role. Vice President French, for example, stated in his June 30, 1993 memorandum to the chairman of the EECS department that "faculty should be awarded tenure only by virtue of *affirmative action by the Board of Trustees.*" (Emphasis added). This language cannot readily be reconciled with the notion that the Board simply ratifies administration decisions and is supposed to do no more.

to say that Dr. Kakaes and the University understood the Board's function in the process to be a mere formality when the Faculty Code contains a provision which specifically identifies a role for the Board—indeed, a dispositive role—in the event of nonconcurrence.

The University also contends that the Code does not require notice of a final decision regarding tenure because the language is prospective: it calls for notice that tenure will not be granted at the end of the faculty member's maximum term of appointment. This argument takes the Code's use of the future tense out of its evident context. The prospective nature of the notice requirement simply reflects the fact that the faculty member will continue to be employed through the end of his maximum term, at which point he will not be granted tenure. The provision requires notice that tenure *will* not be granted, not that tenure might not be granted. Accordingly, an impartial trier of fact could reasonably conclude that in order to comply with the Code, the University was required to complete its decision-making process by the contractual deadline.

The University asserts that "[e]very court faced with similar arguments regarding the sufficiency of notice to faculty has uniformly rejected [the argument that proper notice requires a definitive decision denying tenure]." This statement is not correct. The parties have cited no case law precisely in point, and we have found none. Dr. Kakaes' reading of the notice provision in the Faculty Code, however, finds support in at least two cases in which courts have recognized that notice of the denial of tenure, or of some comparable action, is not effective unless the underlying decision has been made in a timely fashion by the appropriate authority.

In *Papadopoulos v. Oregon State Bd. of Higher Educ.*, 14 Or.App. 130, 511 P.2d 854 (1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974), the court was called upon to interpret a state board regulation requiring twelve months' notice "[i]f any appointment of an academic staff member ... not on indefinite tenure, is to be terminated otherwise than for cause." *Id.* 511 P.2d at 873. No official below the level of the President of the University had the authority to terminate a professor's employment. Professor Papadopoulos had applied for tenure, but he received notice of non-retention before the president had acted on the application. The court held that the notice was deficient because

the relevant inquiry is not whether petitioner had knowledge of the possibility that he would be discharged; rather, the relevant inquiry is whether petitioner received timely notice of termination in compliance with [the regulation]. *It seems obvious that the notice of termination contemplated by [the regulation] is notice from somebody with authority to make the decision to terminate.* We conclude that there is no authority to terminate a professor's employment below the University President level.

*Id.* at 874 (emphasis added); *cf. Perrin v. Oregon State Bd. of Higher Educ.*, 15 Or. App. 268, 515 P.2d 409, 412 (1973), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3078, 41 L.Ed.2d 670 (1974) (distinguishing *Papadopoulos* as a case involving the "problem ... of construing the recommendation of a subordinate as a definitive decision by one entitled to make the decision").

In *Farrington v. School Comm. of Cambridge*, 382 Mass. 324, 415 N.E.2d 211 (1981), the court was called upon to construe a state statute which required that teachers be given notice no later than on April 15 of the current academic year if they were not to be retained for the following year. *Id.* 415 N.E.2d at 212. The court had previously held in *Bonar v. City of Boston*, 369 Mass. 579, 341 N.E.2d 684, 687 (1976), that a teacher is entitled to tenure after three consecutive years of employment unless the appropriate body (in Ms. Farrington's case, the school committee) has provided timely, authorized, and proper notice to the contrary. 415 N.E.2d at 212. Ms. Farrington received an otherwise timely notice from the superintendent of schools. At the time of the notice, however, the school committee had not yet voted on her reappointment. The court held that the notice was defective, and that Ms. Farrington was entitled to tenure:

Tenure may be obtained upon the failure to give timely notice of a decision not to grant tenure or not to nominate for tenure.... *The appropriate authority must in fact have made the decision by the time of the giving of such a notice....* We reject the notion that an unauthorized notice, given before the statutory deadline, properly may preserve an option in the school committee to make an adverse tenure decision at some later date.... *Failure to act seasonably to deny tenure and to give notice of that decision has the effect of "electing" to grant tenure ....*

*Id.* at 213 (emphasis added) (citations omitted).

The issue in this case is at least roughly analogous to the questions resolved by the courts in *Papadopoulos* and *Farrington. See also* James T. Payne, Annotation, *Sufficiency of Notice of Intention to Discharge or Not to Rehire Teacher Under Statutes Requiring Such Notice,* 52 A.L.R. 4th 301, 365–68 (1987 & 1995 Supp.).[8] A reasonable person reading the applicable provisions of the Faculty Code could fairly conclude that the notice provided to Dr. Kakaes in Vice President French's letter of June 28, 1993 suffered from the same defects as did the notices provided to the plaintiffs in those two cases.

*C. Substantial Compliance.*

The University next asserts that, even if the notice to Dr. Kakaes was defective, "[a]ny alleged technical defect ... has no legal significance because the central purpose behind providing timely notice was served, and thus no breach [of contract] occurred." Because "Dr. Kakaes had over a year of continued employment with the University after receiving notice of denial of tenure during which time he could seek another job," the notice, according to the University,

served the purpose for which it was required. The University therefore argues that, as a matter of law, it has substantially complied with its notice obligation under the Code.

The University suggests that Vice President French's letter provided Dr. Kakaes with sufficient warning to allow him to begin looking for a position elsewhere. Upon receiving the letter, however, Dr. Kakaes found himself (to use the vernacular) between a rock and a hard place. He had taught at the University for six years. He had applied for tenure there. His faculty colleagues apparently thought well of him, and the Personnel Committee had unanimously recommended that he be promoted and granted tenure. In his letter of June 28, 1993, Vice President French apprised Dr. Kakaes that the administration disagreed with the Personnel Committee's recommendation, but he also stated that the final decision was up to the Board of Trustees.

Dr. Kakaes was thus left with two less than ideal choices. He could start all over again, seek a position at another institution, and accept such a position if offered, thus in effect giving up his opportunity to remain at George Washington University if tenure was ultimately granted to him. Alternatively, he could take his chances on the possibility of a favorable decision from the Board and defer any efforts to secure placement elsewhere until after the Board had acted. This course of action would, however, entail an increased risk that he would not find a position at all. The notice provision was at least arguably designed to avoid placing professors in just such a quandary.

Moreover, the Board did not make its final decision denying Dr. Kakaes' application for tenure until seven months after the contractual deadline. Rather than the one year's

**8.** The University argues that *Stuckey v. University of S.C.,* 284 S.C. 295, 325 S.E.2d 709 (Ct.App. 1985), is "factually indistinguishable" from this case. We disagree. In *Stuckey,* the court held that a notice of the denial of tenure was timely because it was sent to the plaintiff after the appropriate decision-making authorities had reviewed the plaintiff's application. The plaintiff *appealed* to the state employee grievance committee, but the committee played no part in the direct tenure review process. In fact, "[t]he [c]ommittee expressly refrained from addressing the issue of [the plaintiff's] tenure because it believed it had no authority to do so." *Id.* 325 S.E.2d at 710. In the present case, by contrast, George Washington University's Board of Trustees was authorized to render decisions as to tenure when there was a difference of opinion between the faculty and the administration; indeed, the Board was the *only* body empowered to do so.

notice of a final unfavorable decision arguably contemplated by the Faculty Code, Dr. Kakaes received less than half a year's. An impartial trier of fact could fairly find that this was serious noncompliance, not substantial compliance. We must therefore reject the University's contention that it has demonstrated substantial compliance as a matter of law.

### D. Custom and Practice.

■ According to the University, "[i]t is well-settled law in this jurisdiction that the custom and practice of a university is to be taken into account when interpreting any contract between the university and a faculty member." (Citing *Howard Univ. v. Best,* 547 A.2d 144, 149 (D.C.1988) (*Best II* )). The University contends that the notice provision in the Faculty Code should be read in light of the University's "usual custom and practice [of giving] faculty members notice that they will not be granted tenure without any prior review of the matter by the Board of Trustees." We do not agree that the University's allegations as to custom and practice entitle it to summary judgment.

The University claims that the Board of Trustees becomes involved in very few cases in which the administration has recommended denial of tenure. Specifically, the Board considers tenure applications only in cases like this one, in which the faculty and the administration make conflicting recommendations. This means, according to the University, that its usual custom and practice is to send a notice of denial to an unsuccessful applicant for tenure without any prior action by the Board of Trustees. But if any custom is relevant to this case, it must be the

University's procedure where there is a difference of opinion between the faculty and the administration. In that situation, the University concedes, the Faculty Code provides that variant recommendations "shall be transmitted to the Board of Trustees," evidently for the Board's decision. The University's practice in other situations is of questionable relevance.

The University's custom and practice are not necessarily irrelevant. Procedures utilized by the University with respect to cases in which the faculty and the administration have made conflicting recommendations may properly be considered to resolve any ambiguity in the Faculty Code, in the event that the trial court concludes that such an ambiguity exists. *See Howard Univ. v. Best,* 484 A.2d 958, 967–68 (D.C.1984) (*Best I); see also Best II,* 547 A.2d at 149.[9] The proffered evidence will not, however, support summary judgment in favor of the University.

### III.

### CONCLUSION

■ For the foregoing reasons, the judgment is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*[10]

---

9. We hold on this appeal only that the Faculty Code does not unambiguously support the University's interpretation, and that the University is not entitled to summary judgment. Because the denial of Dr. Kakaes' motion for summary judgment is not a final order and is not appealable, *see* note 4, *supra,* we do not decide whether the language of the Code is sufficiently clear to entitle Dr. Kakaes to summary judgment without regard to any evidence of custom and practice.

10. Dr. Kakaes also contends that the trial judge abused her discretion by denying his motion for leave to amend his complaint. Dr. Kakaes sought in his amended pleading "to make [it] clear that Plaintiff contends he is entitled [to]

relief because the University violated both procedural and substantive provisions of the Faculty Code." He claimed, essentially, that Dean Frieder had failed to present "compelling reasons" for his nonconcurrence with the Personnel Committee's recommendation. We discern no abuse of discretion in the trial judge's denial of Dr. Kakaes' belated motion. *See, e.g., Howard Univ. v. Good Food Servs., Inc.,* 608 A.2d 116, 120–22 (D.C.1992).

Because the question whether the University is in breach of contract has not yet been conclusively determined, we do not decide whether Dr. Kakaes will be entitled to specific performance in the event that he ultimately prevails as to liabili-

ty. *See, generally,* EDWARD YORIO, CON-
TRACT ENFORCEMENT: SPECIFIC PERFOR-
MANCE AND INJUNCTIONS, § 19.1, at 441
(1989). "This court has no authority to issue
advisory opinions regarding questions which
may or may not arise." *District of Columbia v.
Wical Ltd. Partnership,* 630 A.2d 174, 182 (D.C.
1993) (citations omitted).